IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEONTE L. ROBINSON, | § | |
| | § | No. 128, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID Nos. 2103002599, |
| STATE OF DELAWARE, | § | 2008012080A, 2008011822 (N) |
| | § | |
| Appellee. | § | |

Submitted: March 4, 2025
Decided: May 6, 2025

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## <u>**ORDER**</u>

After consideration of the appellant's Supreme Court Rule 26(c) brief, the State's response, and the record on appeal, it appears to the Court that:

(1)  On October 26, 2023, a Superior Court jury found the appellant, Deonte L. Robinson, guilty of illegal gang participation, second-degree conspiracy to promote or facilitate gang participation, second-degree murder as a lesser included offense of first-degree murder, and first-degree conspiracy to commit second-degree murder in Criminal ID Nos. 2008011822 and 2103002599. The convictions arose from gang activities, which included the murder of Shiheem Durham on February 25, 2020. On December 13, 2023, Robinson pleaded guilty to possession of a firearm during the commission of a felony ("PFDCF") in Criminal ID No.

2008012080A in exchange for dismissal of the other charges.[1] This conviction arose from a shooting on August 23, 2020. The Superior Court sentenced Robinson to sixty-five years of Level V incarceration, suspended after twenty-six years for decreasing levels of supervision. This is Robinson's direct appeal.

(2) The evidence presented at trial in Criminal ID Nos. 2008011822 and 2013002599 established that Robinson (known as Herb or Dee Herbo) was a member of Keyzdrive, a gang affiliated with the M-Block Grimy Savages ("MGS") gang. Robinson was friends with Tyrie Burton (known as Bands or Run Bands), a member of MGS, and sometimes lived with Burton in Wilmington. Burton, who entered into a plea agreement and a cooperation agreement with the State, testified about the kinds of activities that he and other gang members like Robinson engaged in. A criminal-intelligence analyst also testified about the activities of Keyzdrive and examples of Robinson's involvement with Keyzdrive and MGS in his social media. In its case-in-chief, the State introduced, without objection, the plea agreements of Keyzdrive and MGS gang members for crimes, including murder, assault, and PFDCF, that they committed throughout 2019 and 2020.

---

[1] The charges in Criminal ID No. 2008012080A were severed from the other cases when Robinson's lawyer realized that he had previously represented the victim in Cr. ID No. 2008012080A. At Robinson's request, this lawyer continued to represent Robinson in the gang and murder cases while the charges arising from the August 2020 incident were severed so that different counsel could represent Robinson in that case.

(3)    On January 24, 2020, Kalil Dixon (who lived in Dover and was known as Lil) posted on Instagram about a friend who was murdered.  Burton reached out to Dixon, who said he was not yet sure who had killed his friend.  A day or two later Dixon sent Burton a message stating "I need somebody who ain't gon play and cash dis check."[2]  Burton responded "herb bro facts n how much" and Dixon replied "[p]rolly like a nickel I'm tryna see wsup now tho."[3]

(4)    Burton testified that these messages meant Dixon was offering to pay a $5,000 bounty for the killing of those involved in his friend's death, and that Robinson, who was with Burton and needed money, was willing to do it.  In FaceTime discussions with Burton, Dixon identified Deontray Watson (known as Pop Off) and Sionne Banks (known as SB) as the targets.  He later identified Shiheem Durham (known as Heem) as another potential target.

(5)    On January 27, 2020, Dixon and Burton exchanged messages about the targets being in Dover.  Burton asked Dixon "you got herb number n yu said 5 right."[4]  Dixon confirmed, and Burton stated "herb said he gone do it."[5]  That same

---

[2] Appendix to Opening Brief Pursuant to Rule 26(c) ("Op. Br. App.") at A1489; State's Trial Exhibit ("Ex.") 181 at 5710-11.

[3] Op. Br. App. at A1491-92; Ex. 181 at 5714-17.

[4] Op. Br. App. at 1493-95; Ex. 181 at 5760-61.

[5] Op. Br. App. at 1496-97; Ex. 181 at 5760-65.

3

day Burton and Robinson exchanged messages about going to Dover, the location of SB and Heem, and "5k."[6]

(6)     According to Burton, the plan changed because Dixon decided that he Burton and Robinson were too well-known in Dover. In addition, Burton was on probation and wearing a GPS ankle monitor. In February 2020, Burton began communicating with Jason Calhum (known as Baby J), a member of and a rapper for MGS, about collecting the bounty. Calhum was willing to do it. He knew Watson and had a plan to meet him under the pretext of selling drugs to him. Calhum was not familiar with Dover so he wanted Burton (as well as Robinson according to Burton) to go with him. Burton contacted Darielle Oliver about driving him, Calhum, and Robinson to Dover.

(7)     On February 25, 2020, Oliver drove Burton, Calhum, and Robinson from Wilmington to Dover in a silver Ford Focus. The cell phone data for Oliver and Calhum showed their phones moving from Wilmington in the morning to Dover in the afternoon. Burton testified, consistently with data from his GPS monitor, that he left Wilmington for Dover with the others. He also testified that Calhum had a gun.

(8)     Robinson's cell phone was in the vicinity of Dover International Speedway around 12:18 p.m. His phone contained a short video file, created at 12:22

---

[6] Op. Br. App. at A1850-52; Ex. 228.

4

p.m., of the road and sky (shot from what appears to be the front passenger seat) with the text "I'm down here grey holler at Pop Off."[7] The phone also contained a 12:31 p.m. Instagram message stating "[w]hat's a good spot to meet wit no cameras."[8]

(9) Burton testified that Oliver dropped him off at Arvel Nesmith's (known as KD or Trey 5) place in the Capitol Park neighborhood because Burton could not be at a homicide scene with his GPS monitor. Nesmith was a friend of Burton, Dixon, and Robinson. He communicated with Robinson throughout the day on February 25th. Burton's GPS monitor was in the Capitol Park area from after 12:30 p.m. to after 2:30 p.m. After stopping in Capitol Park, Oliver, Calhum, and Robinson drove away to meet Watson.

(10) At 1:10 p.m. Nesmith sent Robinson a message asking "[e]verything everything?" to which Robinson responded with two shrugging emojis.[9] Robinson then told Nesmith "[w]e didn't get there yet."[10] At 1:15 p.m., he reported to Nesmith "[w]e on our way back to the park."[11] Nesmith asked "[w]hat it was a no go?" and Robinson told him "[b]ro idk you gotta y'all to babyj."[12] Between 1:18 p.m. and 1:20 p.m., Nesmith and Robinson exchanged messages about returning and parking.

---

[7] Op. Br. App. at 1876; Exs. 241, 242.
[8] Op. Br. App. at 1877; Ex. 244.
[9] Op. Br. App. at 1695; Ex. 216.
[10] *Id.*
[11] Op. Br. App. at 1696; Ex. 216.
[12] *Id.*

5

Nesmith and Robinson also exchanged multiple FaceTime calls between 1:17 p.m. and 1:29 p.m.

(11) Burton testified that Oliver, Calhum, and Robinson returned to Capitol Park without accomplishing the hit. Upon returning to Nesmith's place, Calhum proposed that they tell Dixon the hit was accomplished so they could collect the bounty and cheat Dixon. The others rejected this plan, and Oliver, Calhum, and Robinson left again to meet Watson.

(12) Video surveillance from Generals Greene, a neighborhood not far from Capitol Park, showed the Ford Focus in a parking lot at 1:50 p.m. (according to the surveillance video, which the property manager testified was accurate within five minutes). Calhum's cell phone was in this area between 1:47 p.m. and 1:58 p.m. The surveillance video showed someone briefly getting out of the rear driver's side, walking around, and then getting back in the rear driver's side while leaving the door open.

(13) As a blue Ford Explorer pulled up next to the Ford Focus at 1:55 p.m., a person got out of the rear driver's side of the Ford Focus and fired a handgun into the Ford Explorer. The shooter then got back into the Ford Focus, which drove quickly away. As the Ford Focus drove away, Watson got out of the Ford Explorer and fired multiple times toward the departing car. He then drove away. Police found the Ford Explorer nearby in Kenney Court. Watson was standing outside the

6

vehicle. Durham was inside the front passenger side of the vehicle, dead from a bullet wound to the head. The police took Watson into custody.

(14) Meanwhile, Oliver, Calhum, and Robinson returned to Capitol Park. Robinson's cell phone showed nine attempted FaceTime calls to Nesmith between 1:59 p.m. and 2:00 p.m. At 2:01 p.m. Calhum sent his girlfriend a photo of the bullet-marked driver's side door of the Ford Focus with the message "I just got in a bang out."[13] Robinson's phone also showed a phone call and several FaceTime calls to Dixon between 2:19 p.m. and 2:41 p.m.

(15) According to Burton, they made arrangements to meet with Dixon for payment. Oliver drove Burton, Calhum, and Robinson to a store near Capitol Park where Burton went inside and received approximately $1,500 from Dixon. Burton took some of the money for himself and then went back to the car where he gave the remaining money to Calhum, who gave some of the money to Burton, Oliver, and Robinson. Calhum expressed dissatisfaction with the shortfall in the promised money.

(16) By 3:00 p.m., Oliver was driving Burton, Calhum, and Robinson back to Wilmington. During the drive back, they learned from Dixon and social-media posts that Calhum had killed Durham. Robinson's phone contained a 3:08 p.m. photo of another phone displaying an Instagram post with Durham's photo and the

---

[13] Op. Br. App. at A1828; Ex. 227.

7

text "[r]est easy heem" followed by two broken hearts.[14]  At 3:12 p.m., the lreaper_ Instagram account, which MGS members used to brag about shootings and troll other gangs, posted "[b]oom boom boom pick yo mans up" with a Dover tag.[15] According to Burton, Calhum accessed the lreaper_ account, which was accessible by multiple people including Robinson, to make the post as a way to brag about killing Durham.

(17)    When they arrived in Wilmington, Oliver dropped Calhum off.  Burton testified that the rest of them went to get tape so they could conceal the bullet holes in the car.  He also testified that he and Robinson came up with a plan to get rid of the car by having someone take it from Oliver's house and park it somewhere else so Oliver could report the car stolen.

(18)    According to Burton, Calhum continued to express dissatisfaction about not receiving all of the promised bounty.  Burton testified that he and Robinson returned to Dover several times to meet with Dixon at the Dover Mall and collect additional money that was not shared with Calhum.  The data from Burton's GPS monitor and Dixon's cell phone showed them in the vicinity of the Dover Mall on March 2, 2020.  Burton sent a message to Calhum on March 3rd saying that he and Herb had met Dixon the day before at the Dover Mall.  There was no cell phone data

---

[14] Op. Br. App. at A1892-93; Exs. 235, 236.
[15] Op. Br. App. at A1819; Ex. 199.

8

for Robinson after February 25th because he left his phone in Oliver's car that night while fleeing from an unrelated police stop.

(19)   At the conclusion of the State's case, Robinson's counsel moved for a judgment of acquittal on the murder charge, arguing that there was insufficient evidence of Robinson's involvement in Durham's murder.  The State opposed the motion.  The Superior Court denied the motion, concluding that a rational trier of fact viewing the evidence in the light most favorable to the State could find Robinson guilty beyond a reasonable doubt.  Robinson elected not to testify.

(20)   The jury found Robinson guilty of illegal gang participation, second-degree conspiracy to promote or facilitate gang participation, second-degree murder as a lesser included offense of first-degree murder, and first-degree conspiracy to commit second-degree murder.  The jury found Robinson not guilty of money laundering, second-degree conspiracy as to the money laundering, first-degree criminal solicitation, tampering with physical evidence, and second-degree degree conspiracy as to the tampering. Following a pre-sentence investigation, the Superior Court sentenced Robinson to sixty-five years of Level V incarceration, suspended after twenty-six years for decreasing levels of supervision.

(21)   On appeal, Robinson's appellate counsel ("Counsel") filed a brief and a motion to withdraw under Supreme Court Rule 26(c).  Counsel asserts that, based upon a complete and careful examination of the record, there are no arguably

appealable issues. Counsel informed Robinson of the provisions of Rule 26(c) and provided Robinson with a copy of the motion to withdraw and the accompanying brief.

(22) Counsel also informed Robinson of his right to identify any points he wished this Court to consider on appeal. At Robinson's request, Counsel has submitted points identified by Robinson's mother. The State has responded to the Rule 26(c) brief and has moved to affirm the Superior Court's judgment.

(23) When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must: (i) be satisfied that defense counsel has made a conscientious examination of the record and the law for arguable claims; and (ii) conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[16]

(24) Robinson raises the following points for this Court's consideration: (i) there was conflicting testimony about the number of people in the Ford Focus on February 25, 2020; (ii) Burton's GPS ankle monitor did not always work; (iii) the expert testified that everyone's cell phone appeared at the crime scene, except for Robinson's cell phone; (iv) Watson did not identify Robinson as being involved in the shooting; (v) Burton lied about being dropped off before the shooting and was

---

[16] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *Leacock v. State*, 690 A.2d 926, 927-28 (Del. 1996).

the shooter; (vi) Detective Devon Jones lied and said something else at Calhum's trial; and (vii) jurors were falling asleep. After careful review, we find no merit to these arguments.

(25) We construe Robinson's first five claims as an argument that there was insufficient evidence to support his convictions for second-degree murder and second-degree conspiracy. The Court reviews an insufficiency-of-the-evidence claim *de novo* to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the defendant guilty beyond a reasonable doubt.[17]

(26) A defendant is guilty of second-degree murder when he "causes the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life."[18] He "is guilty of an offense committed by another person when…intending to promote or facilitate the commission of the offense" he "[s]olicits, requests, commands, importunes or otherwise attempts to cause the other person to commit it" or "[a]ids, counsels or agrees or attempts to aid the other person in planning or committing it."[19] When two "or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental

---

[17] *Farmer v. State*, 844 A.2d 297, 300 (Del. 1990).
[18] 11 *Del. C.* § 635(1).
[19] *Id.* § 271(2).

11

state and with that person's own accountability for an aggravating fact or circumstance."[20] A defendant is guilty of first-degree conspiracy when he intentionally aids another person in the planning or commission of a felony and he or the person he is conspiring with commits an overt act in pursuit of the conspiracy.[21]

(27) In arguing that there was inconsistent testimony concerning the number of people in the Ford Focus, Robinson misstates the evidence and misapprehends the State's theory of the case. As Robinson points out, a witness leaving the McDonald's near the Generals Greene parking lot at the time of the shooting testified that she saw a silver car fleeing the scene and that there were three people in the car (two in the front and one in the back). But Detective Jones did not, as Robinson contends, testify that he saw four people in the car on surveillance video from the northbound toll plazas on Route 1. Nor did he testify that Burton was the driver and Oliver was in the front passenger seat as Robinson also claims.

(28) Detective Daniel Grassi testified that he obtained video, which was played for the jury, showing the Ford Focus at the Route 1 northbound and southbound toll plazas on February 25, 2020. Magnified stills from the Dover northbound toll plaza showed the driver and rear driver's side passenger of the Ford

---

[20] *Id.* § 274.
[21] *Id.* § 513(2).

Focus. Detective Grassi identified the driver as Oliver and the passenger as Calhum, but said no one else in the car could be identified.

(29) In any event, it would not be inconsistent with the State's theory of the case for there to be three people in the car at the time of the shooting and four people in the car at the northbound Dover toll plaza after the shooting. As Burton testified and the cell phone and GPS monitor data reflected, Burton, Calhum, Oliver, and Robinson drove to and from Dover together. As Burton also testified, consistently with his GPS monitor, Oliver dropped him off in the Capitol Park neighborhood where he remained while the others went to meet Watson and eventually kill Durham. It would therefore be consistent with the State's theory of what happened on February 25, 2020 for there to be three people (Calhum, Oliver, and Robinson) in the Ford Focus at the time of the shooting, but four people (Burton, Calhum, Oliver, and Robinson) in the Ford Focus at the northbound Dover toll plaza after the shooting.

(30) As to Burton's GPS ankle monitor, Burton testified that he cut it off in the fall of 2019 to spend time with Robinson at Delaware State University in Dover. Burton started wearing the GPS monitor again after he was caught for violating his probation in January 2020. He testified that his GPS monitor functioned properly throughout February and March 2020.

(31) Burton's probation officer testified that Burton was wearing the GPS ankle monitor on February 25, 2020. The GPS monitor showed that Burton was in Wilmington that morning, traveled to Dover mid-day, and then returned to Wilmington. According to the probation officer, there were no signs that Burton's GPS monitor was tampered with or removed on February 25, 2020. Thus, the record is devoid of any indication that Burton's GPS monitor was malfunctioning on February 25, 2020.

(32) We next consider Robinson's claim that the GPS expert (FBI agent William Shute) identified everyone's cell phone, except Robinson's phone, as being at the scene of the shooting. This is a mischaracterization of Agent Shute's testimony.

(33) Agent Shute testified that the February 25, 2020 call detail records and cell site locations showed: (i) Calhum's phone was in close proximity to crime scene between 1:47 p.m. and 1:58 p.m.; (ii) Oliver's phone, which was used less for calls during the relevant time period, was probably within a mile of the crime scene at 1:59 p.m.; and (iii) Robinson's phone, which also was not used for many calls during the relevant time period,[22] was near Camden Wyoming at 1:05 p.m. and was north

---

[22] Agent Shute testified that there would not be geographical data for any text messages or FaceTime calls.

of the crime scene at 2:19 p.m..  He testified that Burton's GPS monitor was in the Capitol Park area between 12:38 p.m. and 2:10 p.m.

(34)  As this evidence reflects, the available call data shows that the phones of Calhum and Oliver were close to the crime scene at the time of the shooting.  The lack of geographical data for Robinson's phone at the time of the shooting is due to the lack of calls on the phone between 1:05 p.m. and 2:19 p.m.—it does not necessarily mean Robinson was somewhere other than the crime scene when the shooting occurred.  Based on his GPS monitor, Burton was in Capitol Park at the time of the shooting.

(35)  Robinson also emphasizes that Watson did not implicate Robinson as being involved in prison phone calls that were played at trial or when he testified.  In the calls, Watson refers to those he thinks were involved as including people from Stevenson, a rapper, RB, a woman who was driving, Lil, and Bands.  At trial, Watson was generally uncooperative, claiming a lack of knowledge on many subjects, including the people mentioned in his prison phone calls.  He testified that he did not know Burton or Robinson.  Although Watson did not implicate Robinson at trial or in his phone calls, other evidence established Robinson's involvement in Durham's murder.

(36)  Robinson next contends that Burton lied at trial about being dropped off in Capitol Park before the shooting and was in fact the shooter.  At trial, Burton

was extensively questioned about his plea agreement, in which the State agreed to reduce or dismiss numerous charges pending against him, and his cooperation agreement. He also admitted that he initially told police on May 20, 2020 that he had no knowledge of the shooting and did not disclose Robinson's involvement until January 7, 2021. As the sole trier of fact, the jury was responsible for determining witness credibility.[23] It was within the jury's discretion to accept Burton's testimony, which was consistent with his GPS monitor, that he was in Capitol Park when the shooting occurred.[24]

(37) Having considered Robinson's claims and the record, we conclude that there was sufficient evidence to support Robinson's convictions for second-degree murder and first-degree conspiracy in connection with the death of Durham. The evidence presented at trial included: (i) the January 2020 messages between Burton and Dixon about Robinson's willingness to pursue the bounty offered by Dixon; (ii) the January 2020 messages between Burton and Dixon about going to Dover and the location of the targets; (iii) Burton's testimony; (iv) the Generals Greene surveillance video; (v) the February 25, 2020 data for the cell phones of Calhum, Oliver, and Robinson; (vi) the February 25, 2020 GPS monitor data for Burton; (vii) the video Robinson posted near Dover International Speedway on February 25,

---

[23] *Tyre v. State*, 412 A.2d 326, 330 (Del.1980).
[24] *Pryor v. State*, 453 A.2d 98, 100 (Del. 1982).

16

2020; (viii) the messages and calls Robinson exchanged with Nesmith on February 25, 2020; and (ix) the call Robinson made to Dixon at 2:19 p.m. on February 25, 2020. Based on this evidence, a rational juror, viewing the evidence in the light most favorable to the State, could find Robinson guilty of second-degree murder and first-degree conspiracy.

(38) Robinson next contends that Detective Jones lied on the stand "and stated something else at Jason Callum trial before it was dismissed due to his lawyer speaking to the prosecutor."[25] Robinson fails to identify what Detective Jones allegedly lied about, and we cannot discern anything in the record to support this claim. Robinson also fails to explain how Detective Jones testified differently at the trial of Calhum and Dixon. According to the State, the Superior Court granted Calhum and Dixon's motion for a new trial, but the basis for the new trial was juror misconduct. These arguments are without merit.

(39) Finally, Robinson claims that three jurors fell asleep during his trial. There are no references to jurors falling asleep in the trial transcripts. In the absence of any evidence to support this claim, we must conclude that it is without merit.

(40) This Court has reviewed the record carefully and has concluded that Robinson's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Counsel has made a conscientious effort to examine

---

[25] Op. Br. Ex. A at 3.

the record and the law and has properly determined that Robinson could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be affirmed.  The motion to withdraw is moot.

BY THE COURT:

/s/ Gary F. Traynor
Justice